**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY CALCHI, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-747 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| TOPCO ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Nancy Calchi presumably wasn't feeling well when she walked into a drug store and bought a bottle of cold medicine in 2021. She wanted to feel better, but she didn't want to feel drowsy. So she picked up a bottle of non-drowsy cold medicine sold by TopCo Associates, LLC.

Calchi took the medication as directed. But she became "unexpectedly drowsy." Calchi believes that the medicine is to blame for her sudden urge to nap. She felt lousy, and then drowsy. And now, she feels duped.

The medicine contained an active ingredient called Dextromethorphan Hydrobromide ("DXM"). Calchi believes that drowsiness is a known side effect of DXM. And she thinks that TopCo ripped her off by labeling the drowsiness-inducing medicine as "non-drowsy."

Months after the drowsiness wore off, Calchi made her way to the federal courthouse. She brings a collection of claims under state law. The gist of the complaint is that Calchi would not have bought the cold medicine if she had known that it caused people to feel sleepy. She seeks to represent a nationwide class of sleepy people.

TopCo moved to dismiss the complaint in its entirety for failure to state a claim.

For the reasons below, Defendant's motion to dismiss is granted in part and denied in part.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Before diving into the facts, the Court offers a few prefatory observations.

This case is the latest salvo in a long-running battle against manufacturers of cold medicine waged by Plaintiff's counsel. And this case isn't Plaintiff Nancy Calchi's first rodeo, either.

A year ago, a judge in the United States District Court for the Central District of California commented on the rash of litigation about drowsiness-inducing non-drowsy cold medicine. "Plaintiff's Counsel has filed more than a dozen class actions across the country against retailers and manufacturers of 'non-drowsy' medications. *See, e.g.*, *Bell v. Glaxosmithkline Consumer Healthcare Holdings US LLC*, No. 2:21-cv-9454 (C.D. Cal.); *Calchi v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, No. 7:22-cv-1341 (S.D.N.Y.); *Calchi v. TopCo Associates, LLC*, No. 1:22-cv-747 (N.D. Ill.); *Davis v. The Kroger Company*, 2:22-cv-2082 (C.D. Cal.); *Gibson v. Albertsons Companies, Inc.*, No. 1:22-cv-642 (N.D. Ill.); *Goldstein v. Walmart, Inc.*, No. 1:22-cv-88 (S.D.N.Y.); *Hall v. Walgreens Boots Alliance, Inc.*, No. 1:22-cv-24 (N.D. Ill.); *Larusso v. CVS Health Corp.*, No. 7:21-cv-10849 (S.D.N.Y.); *Lemus v. Rite Aid Corp.*, No. 8:22-cv-253 (C.D. Cal.); *Lopez v. Target Corp.*, No.

3:22-cv-3069 (N.D. Cal.); *Miner v. Target Corp.*, No. 2:22-cv-380 (D. Nev.); *Prentice v. Perrigo Co.*, No. 1:22-cv-170 (W.D. Mich.); *Romoff v. Johnson & Johnson Consumer Inc.*, No. 2:22-cv-3520 (E.D. Pa.); *Shah v. Perrigo Co.*, No. 8:22-cv-2006 (C.D. Cal.); *Stephens v. Target Corp.*, No. 0:22-cv-1576 (D. Minn.)." *See Meza v. Procter & Gamble Co.*, 2023 WL 3267861, at *2 (C.D. Cal. 2023).

Maybe other cases are out there, too, but this Court hasn't looked. A dozen cases are enough to make the point. A lot of judicial energy is getting devoted to non-drowsy medication.

Strictly speaking, there is nothing wrong with bringing more than one lawsuit about the same subject matter, especially on behalf of different plaintiffs. But cranking out complaint after complaint on the same basic topic does have its downsides.

For one thing, it makes the complaints read like fungible widgets. Counsel has fired up the litigation factory, and the machine spat out another complaint, courtesy of a few clicks and a well-oiled use of copy-and-paste.

The main downside of churning out complaints is that each individual complaint tends to include little to no information about the particular dispute at hand. It's basically a template, with modest changes from complaint to complaint on the margins.

The complaint at hand is a good example. Most of the complaint isn't about the plaintiff, Nancy Calchi, at all. It's about an ingredient in the cold medicine. Most of the paragraphs could apply to any run-of-the-mill sick, drowsy plaintiff.

Specifics about Calchi's personal experience are hard to find. By and large, her personal experience gets crammed into a single paragraph. *See* Am. Cplt., at ¶ 37 (Dckt. No. 47). She almost seems to take a backseat in her own storyline.

The amended complaint tells a story, but it is a short story. In August 2021, Calchi went into a ShopRite in Middletown, New York. Maybe she wasn't feeling well that day, but the amended complaint does not tell the backstory. The complaint says nothing about her symptoms, or her plans for the day.

In any event, she plunked down some cash and picked up a bottle of TopCare "Non-Drowsy" Tussin CF Multi-Symptom Cold Medication. *Id.* The package proclaimed that the over-the-counter medication was "non-drowsy." The amended complaint includes a picture, and sure enough, "non-drowsy" appears front and center:



*Id.* at ¶ 13.[1]

_____

[1] The picture Calchi includes in her complaint is of Tussin DM Max, which may not be the product that she actually took. *See* Am. Cplt., at ¶ 13 (Dckt. No. 47). Calchi alleges that she took Tussin CF Multi-Symptom Cold Medication. *Id.* at ¶ 37. And based on the Court's research, Tussin CF Multi-Symptom Cold Medication appears to be a different product than Tussin DM Max. Even so, everyone agrees that the packaging in question said "non-drowsy."

As Calchi tells it, she read the representation that the cold medicine was non-drowsy, and she relied on it. *Id.* at ¶ 37. In fact, Calchi would not have purchased the cold medicine if she had known that it causes people to feel sleepy. *Id.*

Calchi doesn't reveal why it was important to her to stay awake and alert. Maybe she was driving, or needed to go to work, or something along those lines. If anything, a nap might have helped her feel better. But for now, the key point is that Calchi viewed the representation about non-drowsiness as an important feature of the cold medicine.

Calchi apparently took the cold medicine, and then became "unexpectedly drowsy." *Id.* Specifics are left to the reader's imagination. If anything bad happened, apart from feeling sleepy or surrendering to a siesta, Calchi doesn't say what it was. The complaint simply alleges that the packaging led her to believe that the medication could be taken "during the day, and can be safely and satisfactorily consumed during waking hours, at work, and while driving and operating machinery." *Id.* at ¶ 2.

Calchi believes that the active ingredient, Dextromethorphan Hydrobromide ("DXM"), is the culprit. According to her, drowsiness is a "known side effect" of DXM, and caused her to feel drowsy. *Id.* at ¶ 3; *see also id.* at ¶ 18.

The complaint then includes dozens of paragraphs about DXM. The complaint cites study after study about how DXM can make people want to nod off.

As fate would have it, this case isn't the only case filed by Calchi about drowsiness-inducing non-drowsy cold medicine. She filed the same basic allegations in a separate lawsuit in federal court in the Southern District of New York. *See Calchi v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, No. 7:22-cv-1341 (S.D.N.Y.).

And wouldn't you know it, Calchi claimed that she was duped by another cold medicine manufacturer, too.  In the SDNY, Calchi filed a complaint that was almost identical to the one at hand.

The main difference is that she sued a different manufacturer (GlaxoSmithKline Consumer Healthcare Holdings (US) LLC) about a different product (non-drowsy Robitussin). She filed that complaint on February 16, 2022, only six days after filing the complaint at hand in the Northern District of Illinois on February 10, 2022.

The description about what happened to Calchi in that SDNY case is almost identical to the story that she tells here.  Once again, Calchi alleges that she went shopping for cold medicine at a ShopRite in Middletown, New York.  Once again, Calchi alleges that she intentionally selected non-drowsy cold medicine.  And once again, she took the medicine, became drowsy, and feels duped.

The overlap between the allegations in the case at hand, and the allegations in the SDNY, is easy to spot and hard to miss:

| **The ILND Complaint** | **The SDNY Complaint** |
| --- | --- |
| "In August 2021, Plaintiff bought a bottle of TopCare 'Non-Drowsy' Tussin CF Multi-Symptom Cold Medication from ShopRite in Middletown, New York. The package said 'Non-Drowsy' prominently on the label, and she read and relied on those statements when purchasing the product. . . . When Plaintiff took the medication as directed by Defendant, she became unexpectedly drowsy. She would not have bought this product had she known that the product did, in fact, cause drowsiness, and that drowsiness was a known side-effect of the product." *See* Am. Cplt., at ¶ 37. | "In 2021, Ms. Calchi bought Robitussin Cough + Chest Congestion DM from a ShopRite in Middletown, New York. The package said 'Non-Drowsy' prominently on the label, and Plaintiff read and relied on this statement when purchasing the product. But when Plaintiff took the medication as recommended, she became unexpectedly drowsy. Plaintiff would not have bought this product had she known that the product did, in fact, cause drowsiness, and that drowsiness was a known side-effect of the product." *See* Cplt., at ¶ 34. |

One wonders what happened. Maybe Calchi went on two separate shopping trips, bought two separate bottles of cold medicine, and felt drowsy two separate times. If that's what happened, then one has to wonder whether Calchi's claim is long for this world.

If "non-drowsy" Medicine #1 tricked Calchi and made her feel drowsy, then one has to wonder how Calchi could have reasonably relied on a representation that "non-drowsy" Medicine #2 was non-drowsy. She might have a big fool-me-once, fool-me-twice problem (and an adequacy of class representation problem, too).

Then again, maybe Calchi bought both products on the same day, at the same time, during the same shopping trip to the same ShopRite in Middletown, New York. And maybe she glugged both cold medicines at once. If that's what happened, then one has to ask whether Calchi felt sleepy because she took too much cold medicine.

The punchline is that Calchi is in federal court, claiming that she got duped by "non-drowsy" cold medicine that contained DXM. And she made the same claim six days later, in a second federal court (in the SDNY).

In the case at hand, Calchi filed suit against TopCo Associates, LLC, the manufacturer of the drug. The amended complaint includes six counts.

The first count is an amalgamation of claims under the statutes of 43 states, plus Washington, D.C. Calchi alleges that the labeling violated consumer-protection statutes, by misleading customers into believing that the medicine was non-drowsy.

The second and third counts focus on New York law (only). Calchi alleges violations of sections 349 and 350 of New York's General Business Law, which prohibit deceptive acts and practices.

The fourth count is a breach of express warranty claim. The fifth claim alleges a violation of the Magnuson-Moss Warranty Act. And the sixth claim alleges intentional misrepresentation.

Calchi filed suit on behalf of herself and a putative nationwide class. She seeks monetary and injunctive relief.

TopCo moved to dismiss.

The first step in every case is subject matter jurisdiction. And this Court previously issued a decision to solidify its jurisdictional footing. Calchi brings only state-law claims, so she needs a basis to bring them in federal court. She invoked diversity jurisdiction.

TopCo is a limited liability company. Ordinarily, a limited liability company has the citizenship of its members when it comes to citizenship for diversity jurisdiction. That is, a limited liability is usually treated like a partnership, because the citizenship of a partnership depends on the citizenship of its partners. *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990); *Mut. Assignment & Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858, 861 (7th Cir. 2004).

But this case falls under the Class Action Fairness Act. And under that statute, Congress changed the rules when it comes to citizenship.

In a case under the Class Action Fairness Act, an unincorporated association is a "citizen of the State where it has its principal place of business and the State under whose laws it is organized." *See* 28 U.S.C. § 1332(d)(10); *see also* 28 U.S.C. § 1332(c)(1). The term "unincorporated association" sweeps broadly and reaches entities such as LLCs. Under the Class Action Fairness Act, a limited liability company is an "unincorporated association," which means that it is treated like a corporation for purposes of diversity jurisdiction.

So, a limited liability company is treated like a *corporation* in a case under the Class Action Fairness Act, even though a limited liability company is treated like a *partnership* when it comes to diversity jurisdiction more generally. The jurisdictional yardstick is different, depending on the type of case. It might seem funny for a limited liability company to swap passports and have a different citizenship, depending on the nature of the case. But Congress gets to set the rules.

Last year, this Court issued a decision concluding that a limited liability company is an "unincorporated association" within the meaning of the Class Action Fairness Act. *See* 6/7/23 Mem. Opin. & Order (Dckt. No. 52). At that point, no Circuit precedent was on point. But since then, the Seventh Circuit has weighed in.

The Seventh Circuit landed in the same place. The Court of Appeals confirmed that a limited liability company is an "unincorporated association" within the meaning of the Class Action Fairness Act. *See City of East St. Louis, Illinois v. Netflix, Inc.*, 83 F.4th 1066, 1071 (7th Cir. 2023).

The jurisdictional footing is solid, so the Court turns to the merits of the claims.

### Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

## Analysis

The amended complaint includes six claims. In Count I, Calchi alleges violations of state consumer-protection laws. She brings that claim on behalf of herself and a subclass of consumers who live in most of the states from sea to shining sea. She refers to that group as the "Consumer Protection Subclass." *See* Am. Cplt., at ¶¶ 39, 49 (Dckt. No. 47).

In Counts II and III, Calchi alleges violations of New York's General Business Law. She brings those claims on behalf of herself and a subclass of consumers who purchased Non-Drowsy TopCo products in New York, referred to as the "New York Subclass." *Id.* at ¶¶ 40, 56, 65.

In Counts IV to VI, Calchi brings claims for breach of warranty and intentional misrepresentation. She brings those claims on behalf of herself and all persons who purchased a Non-Drowsy TopCo product in the United States during the applicable statute of limitations, referred to as the "Nationwide Class." *Id.* at ¶¶ 38, 74, 81, 90.

The Court will address each in turn.

## I. Two Federal Hurdles

In Count I, Calchi alleges that TopCo violated the consumer-protection statutes of 43 states and the District of Columbia. *Id.* at ¶ 49. The consumer-protection statutes prohibit unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or services to consumers. *Id.* at ¶ 50.

10

Calchi's theory is that by labeling TopCo products containing DXM as non-drowsy, TopCo misrepresented its products and violated several state consumer-protection statutes. *See id.* TopCo disagrees.

Before diving in to the state-law claims, this Court needs to overcome two potential federal hurdles: federal preemption, and standing.

## A. Preemption.

TopCo begins with the argument that federal law preempts Calchi's claims under the state consumer-protection statutes.[2] As TopCo sees it, federal preemption means that Calchi cannot bring the state-law claims at all.

Federal preemption stems from the Supremacy Clause, which makes clear that the Constitution and laws of the United States are the "supreme Law of the Land." *See* U.S. Const. art. VI, cl. 2. The Supremacy Clause "invalidates state laws that interfere with, or are contrary to federal law." *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019) (cleaned up).

In other words, federal law can preempt state law. *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Sometimes federal law and state law play well together in the sandbox. And sometimes federal law kicks state law out of the sandbox.

Preemption comes in different varieties. The case at hand involves express preemption, which occurs when a federal statute says "explicitly what states may and may not do." *Nationwide Freight Sys., Inc. v. Illinois Com. Comm'n*, 784 F.3d 367, 373 (7th Cir. 2015).

---

[2] TopCo brings its argument under Rule 12(b)(6). But preemption is an affirmative defense, so "[m]oving for judgment on the pleadings under Rule 12(c) is the more appropriate way to address an affirmative defense." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019).

The Food, Drug, and Cosmetic Act ("FDCA") is the federal statute that regulates the marketing and labeling of drugs. *See Novotney v. Walgreen Co.*, 683 F. Supp. 3d 785, 789 (N.D. Ill. 2023). It creates a nationwide scheme for regulating drugs to "protect the health and safety of the public at large." *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 108 (2014). To that end, it expressly preempts some state regulation of drugs.

The FDCA prohibits states from "establish[ing] . . . any requirement . . . that is different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." *See* 21 U.S.C. § 379r(a)(2). So the FDCA expressly preempts "state-law theories that impose requirements 'not identical' to its own requirements." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 645 (7th Cir. 2019).

One of those federal requirements involves misbranding. The FDCA prohibits the misbranding of drugs. *See* 21 U.S.C. § 331(b) ("The following acts and the causing thereof are prohibited: . . . The adulteration or misbranding of any food, drug, device, tobacco product, or cosmetic in interstate commerce."). The statute provides that drugs are misbranded if the labeling is "false or misleading in any particular." *See* 21 U.S.C. § 352(a)(1).

The FDCA also gives the Secretary of Health and Human Services the power to create regulations to enforce the FDCA. *See* 21 U.S.C. § 371(a). The Secretary issues regulations through the FDA. *See* 21 U.S.C. § 393. The FDA has developed a comprehensive regulatory scheme for nonprescription drugs (also called over-the-counter drugs), like the cough medicine bought by Calchi.

The FDA regulates over-the-counter medications using the so-called "monograph process." *See* OTC Drug Review Process | OTC Drug Monographs, U.S. Food & Drug Administration, https://www.fda.gov/drugs/otc-drug-review-process-otc-drug-monographs (last

accessed 7/30/24). A monograph essentially sets out the federal requirements for a given category of nonprescription drugs. *See* 21 C.F.R. § 330.1.

The monograph goes through a lengthy notice-and-comment process. That process includes review by a panel of experts, two public comment periods, and a final review. *Id.* at § 330.10(a). But once the process is complete, the monograph "establish[es] conditions under which a category of OTC drugs or a specific drug are generally recognized as safe and effective and not misbranded." *See* 21 C.F.R. § 330.10(a)(9).

Over two decades ago, the FDA published a monograph governing over-the-counter cough medication. *See* Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Final Monograph for OTC Antitussive Drug Products, 67 Fed. Reg. 78,158 (Dec. 23, 2002) (codified at 21 C.F.R. § 341(b)(3)). The monograph establishes labeling requirements for products containing certain active ingredients, including DXM. *See* 21 C.F.R. §§ 341.74(b)(vi) & (vii), 341.74(c)(v) & (vi), 341.74(d)(iii).

For some active ingredients, the monograph requires a disclosure that medications using that ingredient "may cause drowsiness." *See id.* at § 341.74(c)(4)(vii) (requiring drowsiness warnings for diphenhydramine citrate and diphenhydramine hydrochloride).

The monograph requires other warnings for DXM in particular. *See, e.g.*, *id.* at § 341.74(c)(4)(v), (vi) (requiring a warning for children taking certain other drugs). But the monograph does not require a drowsiness warning for DXM. "The FDA tellingly did not require a warning on oral antitussives that contain DXM that they may cause drowsiness." *Goldstein v. Walmart, Inc.*, 637 F. Supp. 3d 95, 110 (S.D.N.Y. 2022). The FDA expressly considered the claim that "DXM caused drowsiness and determined that insufficient data existed to support such a finding." *Id.*

So, the FDA requires a drowsiness disclosure for some drugs, but *not* DXM. And on the flipside, the FDA requires some disclosures for DXM, but *not* a drowsiness warning.

Calchi brought her state-law claims in the context of that regulatory backdrop. Calchi brought state-law claims because the FDCA does not create a federal private right of action. *See Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011). TopCo responded by asserting federal preemption, which is an affirmative defense. So TopCo bears the burden of showing that the claims are preempted. *See Benson*, 944 F.3d at 645.

TopCo argues that Calchi's claims are preempted because Calchi's theory would create separate requirements that are "not identical" to the federal requirements. *Id.* After all, the FDA monograph did not require medications with DXM to give a drowsiness disclosure. *See* Mtn. to Dismiss, at 7 (Dckt. No. 49). So, TopCo complied with all the labeling requirements laid out in the monograph. And TopCo thinks that any other requirements created by state law would be preempted because they would not be "identical" to the federal requirements.

In response, Calchi concedes that TopCo complied with all of the labeling requirements explicitly laid out in the monograph. TopCo gave every disclosure required by the FDA. But Calchi argues that TopCo cannot add false or misleading information to the label. *See* Pl.'s Resp. Brf., at 3–4 (Dckt. No. 51).

District courts around the country have considered similar labels on medication, and have landed in different places.

Some courts have found no preemption after narrowly construing the "identical" requirement. Those courts reason that a requirement to *add* labeling not required by federal law is different from a requirement to *remove* false and misleading labels. In their view, federal law would preempt a state law that added a disclosure, but would not preempt a state law that

14

prohibited a false statement.  *See, e.g.,* Order, *Harris v. Supervalu, Inc.*, No. 22-cv-2863 (N.D.

Ill. 2024), ECF No. 35; *Stephens v. Target Corp.*, 2023 WL 6218060 (D. Minn. 2023); *Davis v.

The Kroger Co.*, 2023 WL 9511156 (C.D. Cal. 2023); Order Granting in Part Defs.' Mtn. to

Dismiss, *Davis v. The Kroger Co.*, No. 2:22-cv-2082 (C.D. Cal. 2023), ECF No. 51; Order

Granting in Part and Denying in Part Def.'s Mtn. to Dismiss, *Carrigan v. Bayer Healthcare LLC*,

No. 22-cv-3780 (D.N.J. 2023), ECF No. 31; *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269,

1276 (C.D. Cal. 2022).

 Other courts have looked at the same question, and given a different answer.  Those

courts construe the "identical" requirement more broadly.  In their view, any separate state-law

requirement is "different from" and is not "identical with" the existing federal regulations.  *See

Goldstein v. Walmart, Inc.*, 637 F. Supp. 3d 95, 109 (S.D.N.Y. 2022) ("[T]he FDA required a

'may cause drowsiness' label with some products and considered whether it should require a

similar label with DXM products.  It concluded it need not.  The subject of whether cough

medicines with DXM should carry a drowsiness label thus was explicitly considered by the

FDA."); *Calchi v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 2023 WL

2447399 (S.D.N.Y. 2023) (adopting *Goldstein*'s reasoning); *Amara v. Publix Supermarkets, Inc.*,

2022 WL 2257575, at *4 (M.D. Fl. 2022); *In re PepsiCo, Inc., Bottled Water Mktg. and Sales

Practices Litig.*, 588 F. Supp. 2d 527, 535 (S.D.N.Y. 2008) (finding preemption in a case about a

false statement about the source of Aquafina water) ("[T]he FDA specifically addressed the

disclosure of source information and determined, in its expert opinion, that representations of

source are immaterial in the context of purified water.").

 "Under this standard, preemption is certainly appropriate when a state law prohibits

labeling that is permitted under federal law. But it is *also* appropriate when a state law prohibits

labeling that is *not prohibited* under federal law. The standard, in other words, is not whether a state law actively undermines federal law. It is whether state law diverges from federal law *at all.*" *Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 375 (S.D.N.Y. 2014) (emphasis in original).

There is something to be said for the latter perspective. Again, the statute preempts any state requirement that is "different from or in addition to, or that is otherwise not identical with, a requirement under this chapter." *See* 21 U.S.C. § 379r(a)(2). A state law that prohibits using the label "non-drowsy" for DXM seems "different from" the federal regulation, which doesn't ban calling DXM "non-drowsy." They're different – the state law bans it, and the federal regulation doesn't take a position one way or the other.

Imagine going to Yellowstone. Imagine if the federal government through the Department of the Interior issued a list of rules and regulations for visitors. The list might include, for example, "stay on the trails," "don't get too close to a buffalo," and "don't feed the bears." Imagine if the state of Wyoming had a list of rules, too. And imagine if the state's list included another prohibition: "don't swim in the rivers." That rule seems "different from," "in addition to," or "otherwise not identical with" the federal standard. *See* 21 U.S.C. § 379r(a)(2). If federal law prohibits all non-identical rules about Yellowstone, then a state rule about staying out of the rivers seems preempted (even though the state rule also seems like a good idea).

The Seventh Circuit addressed a similar FDCA preemption issue in *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468 (7th Cir. 2020). It weighed in on the labeling of cheese.

In *Bell*, the plaintiffs had purchased grated cheese products labeled "100% Grated Parmesan Cheese." *Bell*, 982 F.3d at 474. But the ingredient lists revealed that those products contained cellulose powder and potassium sorbate as well. *Id.* at 474. In other words, those

products were not 100% cheese.  So, the plaintiffs brought a claim under state consumer-protection statutes, arguing that the "100%" label was misleading.

*Bell* dealt with food, not drugs.  But the same statute applies.  The FDCA authorizes the FDA to issue regulations about the labeling of food as well as drugs (hence the name of the agency).  *Id.* at 483 (citing 21 U.S.C. § 341).  But instead of creating a monograph, the FDA creates a "standard of identity" that establishes requirements for what a food product must contain to be marketed under a certain name.  *Id.*  And, just like for drugs, the FDCA expressly preempts any state law requirement "that is not identical to such standard of identity" for that food.  *See* 21 U.S.C. § 343-1(a)(1).

When it comes to cheese, the FDA standard of identity required only that the label call the item "Grated Parmesan Cheese."  *Bell*, 982 F.3d at 483.  In other words, the standard of identity was silent about whether the products could be labeled as "100%" cheese.  *Id.*

Defendants argued that "any state-law ruling that prohibited them from using the phrase '100% cheese' would establish a requirement *not identical* to those set out in the FDA's standard of identity."  *Id.* (emphasis added).  In their view, a new prohibition is something new, and the statute prohibits the states from setting new requirements.

The Seventh Circuit disagreed.  It found the defendants' reading of the preemption provision too broad.  *Id.* at 483–84.  To be sure, the Court of Appeals recognized that "state law may not tack on further required disclosures that the federal standard does not mention."  *Id.* at 484; *see also Turek*, 662 F.3d at 427.  But the Court of Appeals drew a distinction between requiring additional affirmative disclosures and "stop[ping] [the] defendants from voluntarily adding deceptive language to the federally permitted labels."  *Bell*, 982 F.3d at 484.

The Seventh Circuit held that preventing deception did not establish "any new requirement different from the standard of identity." *Id.* On the contrary, "the FDCA already provides generally that 'a food shall be deemed to be misbranded' if its labeling is 'false or misleading in any particular.'" *Id.* (citing 21 U.S.C. § 343(a)(1)). So the Seventh Circuit held that, "[a]bsent language in a standard of identity that protects a particular statement, § 343-1 does not expressly preempt state-law prohibitions on deceptive statements that sellers add voluntarily to their labels or advertising." *Id.*

The Seventh Circuit provided a helpful illustration. Imagine if a standard of identity required a vegetable to include its color, date of harvest, and common name. *Id.* In that case, "the preemption provision would prohibit a state from adding a further requirement that all vegetable labels also list the country of origin." *Id.* On the other hand, "if a seller chose voluntarily to add a country of origin – and lied about it – then [the FDCA] would not preempt state law from requiring the seller to remove the voluntarily-added lie." *Id.*

The punchline is that this Court is not writing on a blank slate. This Court must follow the Seventh Circuit. And this Court concludes that *Bell* squarely applies here.

Here's another way to express the principles in *Bell*. When it comes to preemption, there is a difference between a state saying "you must say 'X'" and a state saying "you can't say 'Y.'" A state can't add to the list of disclosure requirements imposed by the FDA. So, if the FDA requires a drug maker to disclose A, B, and C, a state can't add to the list and force a drug maker to disclose A, B, C, and D. The scope of disclosure is within the federal domain.

But when it comes to what a drug maker *can't* say, states have a little room to maneuver. A state can't prohibit a drug maker from disclosing A, B, and C if the federal government requires the disclosure of A, B, and C. A state can't prohibit what the federal government

requires. But if the federal government has not addressed a statement about D, then states can ban a statement about D if the states believe that D is false. States can ban false statements if the federal government has not stepped in and exercised its power over that topic.

The lack of preemption may turn on the fact that the FDCA itself prohibits the misbranding of food and drugs, and misbranding takes place "[i]f its labeling is false or misleading in any particular." *See* 21 U.S.C. § 352. That is, federal law *itself* prohibits false and misleading labeling. A state law that prohibits false and misleading statements doesn't add anything new, because federal law already prohibits false and misleading statements. *See Bell*, 982 F.3d at 484.

So, unless a monograph "protects a particular statement," the preemption provision of the FDCA "does not expressly preempt state-law prohibitions on deceptive statements that sellers add voluntarily to their labels or advertising." *Bell*, 982 F.3d at 484. The FDCA already prohibits "false or misleading" labeling, so a state law that prohibits false or misleading labeling doesn't create a new requirement different from the FDCA.

Then again, maybe this issue boils down to an all-too-common, all-too-important question: who decides? The FDCA bans false or misleading statements. But who decides if a statement is false or misleading? If the FDA looked at a statement, and took no position on whether it is false or misleading, can the states ban it? Is a statement false and misleading only if the federal government says so? What if the federal government *doesn't* say that it is false or misleading? Can the states ban a statement as false or misleading if the FDA does not take a position on it, one way or the other?

Those questions are academic, because this case falls squarely within the boundaries of *Bell*. The *Bell* decision compels the holding that Calchi's claims are not preempted.

Calchi doesn't allege that TopCo should have included a "may cause drowsiness" label on its medicine. *That* claim would be preempted. That claim would add a disclosure requirement that the FDA did not impose.

Instead, Calchi alleges only that TopCo should not have voluntarily placed a misleading "Non-Drowsy" label on its medicine. *See* Pl.'s Resp. Brf., at 3–4 (Dckt. No. 51). Under *Bell*, that state-law claim is not preempted by the FDCA.

Again, other courts have looked at the same question and landed in a different place. Some district courts in other circuits have concluded that "preemption cannot be addressed by facile reference to whether a claim sounds in affirmative misrepresentation or misleading omission." *Goldstein*, 637 F. Supp. 3d at 111. There is something to be said for that perspective.

But this Court takes its marching orders from the Seventh Circuit. And the Seventh Circuit has ruled that "while states may not require sellers to *add* further labeling that is not required by federal law, they may prevent sellers from voluntarily adding deceptive content that is not required by federal law." *Bell*, 982 F.3d at 487. Calchi alleges that TopCo has voluntarily added a deceptive "Non-Drowsy" label. So, Calchi's claims are not preempted.

## B. Standing

The other potential hurdle is standing. Standing is a basic part of subject matter jurisdiction. Federal courts aren't in the business of deciding disputes when a plaintiff suffered no harm, or when a plaintiff didn't suffer a harm caused by the defendant, or when the courts can't do anything about it.

TopCo makes a standing argument based on state law. Calchi bought cold medicine in New York, and she filed two claims based on New York law. But she wants to represent a putative nationwide class, and she invokes the statutes of 43 other states (and D.C.). In TopCo's

view, Calchi does not have standing to assert claims under the laws of other states because "she alleges no facts connecting her claim with any other state." *See* Mtn. to Dismiss, at 9 (Dckt. No. 49).

Standing requires an injury in fact caused by the defendant that is redressable in court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Calchi alleges that she bought TopCo's medicine and that she suffered an economic injury from misleading labeling. That is enough for standing for Article III purposes.

Whether Calchi can represent anyone else is another story. Courts in this district have split over whether the ability of a class representative to represent class members from other states is a standing problem, or a class certification problem. *See Slowinski v. BlueTriton Brands, Inc.*, 2024 WL 3757097, at *7–8 (N.D. Ill. 2024) (collecting cases). But as this Court recently explained, the prevailing view is that "whether a plaintiff can represent a multi-state class [is] a substantive issue, not a standing issue." *Id.* at *8.

TopCo's concern is about whether Calchi can represent a nationwide class under Rule 23. That question "is one of statutory interpretation; it does not implicate Article III standing or jurisdiction." *Woodman's Food Mkt., Inc., v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016). Calchi's ability to represent the class is "best addressed at the class certification stage." *Terrazzino v. Wal-Mart Stores, Inc.*, 335 F. Supp. 3d 1074, 1082 (N.D. Ill. 2018).

Calchi has standing to get her foot in the door. So, the case can roll forward. Whether Calchi can represent drowsy people in other states is a question for a later day.

II.     **New York's Consumer-Protection Laws (Counts II & III)**

Federal obstacles do not stand in the way, so the Court turns to the merits of the motion to dismiss the state-law claims. TopCo did not move to dismiss the claims under any of the state statutes, except the claims under New York law. So the Court turns there.

In Counts II and III, Calchi alleges that TopCo's "non-drowsy" label violated two provisions of New York's consumer-protection laws. *See* Am. Cplt., at ¶¶ 55–72 (Dckt. No. 47). These provisions prohibit "[d]eceptive acts and practices" and "[f]alse advertising," respectively. *See* N.Y. GEN. BUS. LAW §§ 349, 350.

To state a claim, a plaintiff must allege that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *See Maurizio v. Goldsmith*, 230 F.3d 518, 520 (2d Cir. 2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 647 N.E. 2d 741 (N.Y. 1995)). A "deceptive act" is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* (citing *Oswego*, 647 N.E. 2d at 745).

TopCo challenges the claims on a few different grounds. In its view, Calchi has not alleged a material misrepresentation, or has not alleged that any such representation would have misled a reasonable consumer. TopCo also argues that Calchi never suffered an injury. Finally, TopCo seeks refuge in a safe harbor under the statute.

The Court will address each argument in turn.

A.      **A Materially Misleading Statement**

TopCo begins with the argument that the phrase "non-drowsy" is not materially misleading. TopCo thinks that Calchi does not sufficiently allege that its medication causes drowsiness. *See* Mtn. to Dismiss, at 11 (Dckt. No. 49).

That's a tough hill to climb at the motion-to-dismiss stage. The argument doesn't get TopCo very far.

The complaint includes lots of allegations about the slumber-encouraging powers of DXM. Calchi pointed to the National Library of Medicine, which lists drowsiness as a side effect of DXM. *See* Am. Cplt., at ¶ 19 (Dckt. No. 47). She flagged a scientific study showing that DXM caused increased rates of drowsiness. *Id.* at ¶ 20.

Calchi also cited the FDA's adverse-event report database, which says that drowsiness is a frequently cited side effect of DXM. *Id.* at ¶ 21. And she pointed to guidance from the Federal Aviation Administration telling pilots to avoid flying after taking DXM because it may cause drowsiness. *Id.* at ¶ 21.

TopCo believes that DXM does not cause drowsiness. TopCo discredits the scientific study as one conducted by a company that manufactured a competing product.

Maybe TopCo is right. But that's not a motion-to-dismiss argument. The reliability or accuracy of the evidence "is an issue of fact the Court cannot resolve on a motion to dismiss." *See Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 544 (S.D.N.Y. 2013). At the motion-to-dismiss stage, this Court must take the factual allegations as true, drawing all inferences in Calchi's favor. *See Hofer*, 649 F.3d at 614.

Calchi alleged that the cold medicine caused drowsiness because it contains DXM. At this stage, that allegation is enough to get the claim to the next stage of the case, meaning discovery.

## B.     A Reasonable Consumer

Next, TopCo argues that the phrase "non-drowsy" could not mislead a reasonable consumer. *See* Mtn. to Dismiss, at 10 (Dckt. No. 49).

Sometimes "a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). But "it must proceed with care in doing so as the inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage." *Budhani v. Monster Energy Co.*, 527 F. Supp. 3d 667, 676 (S.D.N.Y. 2021) (internal quotation marks omitted). As always, "context is crucial." *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018).

Claims cannot rest on "unreasonable or fanciful interpretations of labels or other advertising." *See Bell*, 982 F.3d at 477–78; *see also Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 940 (7th Cir. 2001) (dismissing a claim of deceptive advertising because the product's label "eliminates any possibility of deception" and "can only be read" in a nondeceptive way); *Sneed*, 2023 WL 2019049, at *2 ("Whether a statement is deceptive is usually an issue of fact. However, when a deceptive advertising claim is based on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may be justified.") (cleaned up); *Curtis v. 7-Eleven, Inc.*, 2022 WL 4182384, at *12 (N.D. Ill. 2022) ("To determine the likelihood of deception, courts apply a 'reasonable consumer' standard. 'This requires more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public . . . acting reasonably in the circumstances, could be misled.'") (citation omitted) (alterations in original) (quoting *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). "It's well settled that a label is not deceptive as a matter of law when the plaintiff's interpretation is so facially illogical, implausible, or fanciful that no

reasonable consumer would think it – and that dismissal is warranted in those circumstances." *Bell*, 982 F.3d at 493 (Kanne, J., concurring).[3]

Sometimes a complaint includes such an outlandish theory that no reasonable consumer could fall for it. "In some cases, the allegation of a misrepresentation is outside the field of play, meaning that no reasonable consumer could have been deceived. In that case, a court can dismiss the claim on a motion to dismiss." *See Geske v. PNY Tech., Inc.*, 503 F. Supp. 3d 687, 705 (N.D. Ill. 2020); *see also Bober*, 246 F.3d at 938–39; *Fuchs v. Menard, Inc.*, 2017 WL 4339821, at *5 (N.D. Ill. 2017); *Matthews v. Polar Corp.*, 2023 WL 4534543 (N.D. Ill. 2023) (dismissing allegations that lemon bubble water wasn't lemony enough); *Gardner v. Ferrara Candy Co.*, 2023 WL 4535906 (N.D. Ill. 2023) (dismissing allegations that caramel candy wasn't creamy enough).

TopCo asks this Court to declare, at the motion-to-dismiss stage, that no reasonable consumer could get duped by the phrase "non-drowsy." That's a big ask. Too big.

Not everyone wants to feel sleepy after taking cold medicine. Drivers don't. Neither do people who want to feel better while pushing through the workday.

At this stage, the complaint does more than enough to plausibly allege that the "non-drowsy" label would mislead a reasonable consumer.

## C.      Injury

The next argument involves the need for an injury. TopCo believes that Calchi did not suffer an injury by buying a non-drowsy product that made her drowsy.

The complaint alleges an economic injury. Calchi alleges that she would not have purchased the non-drowsy cold medicine if she had known that it would make her drowsy. *See*

---

[3] True, most of these cases involve Illinois law, not New York law. But they stand for broad principles, and this Court has no reason to think that Illinois law and New York law are any different in this area.

Am. Cplt., at ¶ 37 (Dckt. No. 47). That's enough for a pocketbook injury. She parted with money in her back pocket, and the money would still be there but for the misrepresentation.

In a similar vein, Calchi argues that she would not have purchased the cold medicine "on the same terms" if she had known that the medication would make her drowsy. *Id.* That allegation is more difficult to understand. It is unlikely that the ShopRite in Middletown, New York, would have entertained a request for haggling. Drugstores typically don't entertain discussions about price – it's not like buying a rug in a Turkish bazaar.

In a similar vein, Calchi floats the theory that the "non-drowsy" label "allowed Defendant to charge a price premium." *See* Am. Cplt., at ¶ 71 (Dckt. No. 47). That is, TopCo charged more for the product because it said "non-drowsy," and would have charged less without it.

That theory may or may not have legs. For that theory to work, Calchi would have to allege that she would have purchased the product, at a lower price, if the product did not contain the misleading label.

By way of illustration, imagine if TopCo sold the medicine for $5, and used the "non-drowsy" label. For Calchi's theory to work, she would have to allege that the product would have cost less without the label (say, $4), *and* that she would have purchased it without the label.

In that scenario, Calchi would have paid less. And TopCo would not have tricked her into believing that the medicine was non-drowsy, because TopCo would not have made any representations about drowsiness.

Even so, under her theory, Calchi would have purchased cold medicine that made her sleepy. After all, the medicine would still contain DXM. The only difference is that she would have paid less, and she would not have had any expectations about drowsiness.

26

A price-premium theory of injury might work. But it depends on how the consumer would have behaved in the but-for world of a lower price and no misrepresentation. Would Calchi have purchased the product (again, for less money) if the product did not contain the misrepresentation?

Here, the complaint alleges that Calchi relied on the promise of non-drowsiness. *Id.* at ¶¶ 37, 59, 68. She alleges that the representation of non-drowsiness was important to her decision when selecting a cold medicine. So maybe she would not have purchased the product at all without that representation. Maybe she would have picked a different brand.

TopCo thinks that Calchi needed to do more to plead an injury. TopCo relies primarily on a line of cases stemming from *Izquierdo v. Mondelez International, Inc.*, 2016 WL 6459832 (S.D.N.Y. 2016).

In *Izquierdo*, the court stated that the New York statute requires a complaint to "allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Id.* at *7 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 302 (2d Cir. 2015)). The court noted that the benefit-of-the-bargain theory could stem from a "price premium," where "a plaintiff pays more than she would have but for the deceptive practice." *Id.* The court ultimately dismissed the complaint because plaintiffs "[did] not allege[] that they paid a *higher* price for the [product] than they otherwise would have, absent deceptive acts." *Id.*

TopCo relies too heavily on *Izquierdo*. As another court put it, "[t]o the extent that *Izquierdo* merely holds that plaintiffs cannot redress an injury under GBL sections 349 or 350 where they do not 'allege[] that they paid a *higher* price for the [product] than they otherwise would have, absent deceptive acts,' . . . [p]laintiff's allegations satisfy *Izquierdo* because she has alleged that she paid a higher price for the [product] than she would have paid absent the

[misleading] claims." *Greene v. Gerber Products Co.*, 262 F. Supp. 3d 38, 69 (E.D.N.Y. 2017) (emphasis in original).

TopCo seems to believe that *Izquierdo* requires more specificity when it comes to the facts. But other courts within the Second Circuit have cautioned against overreading *Izquierdo*. Reading that opinion to require more factual specificity "contradicts the weight of the law in [the Second] Circuit." *Id.*; *see also Izquierdo v. Panera Bread Co.*, 450 F. Supp. 3d 453, 465 (S.D.N.Y. 2020) ("[A]t least three district courts in [the Second] Circuit have disagreed with the holding of *Izquierdo* because it contradicts the weight of the law in this Circuit." (internal quotation marks omitted)). "Courts routinely allow complaints that lack allegations of both cheaper and exactly comparable products to survive motions to dismiss." *Id.* (collecting cases); *see also Orlander*, 802 F.3d at 302.

Calchi alleges that she bought a product, and would not have purchased the product without the misrepresentation. That's enough to allege an injury. She also alleges that she paid more for the product than she otherwise would have paid. Based on this complaint, that theory is a bit shakier, but it is enough to get to the next stage of the case.

Calchi "allege[d] that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Orlander*, 802 F.3d at 302. That is enough to plausibly allege an injury.

### D. Safe Harbor

TopCo's final argument is that its conduct falls into a safe harbor in the statute.[4] The safe harbor makes it a "complete defense" to a deceptive act or practice claim if the act or practice in

---

[4] A similar safe harbor exists in § 350, though TopCo does not specifically invoke its protection. This may be for good reason, as the safe-harbor provision in § 350 references the rules and regulations of agencies of *New York*, not of the United States. *See* N.Y. Gen. Bus. Laws § 350d-(a) ("In any such action it shall be a complete defense that

question is "subject to and complies with the rules and regulations of, and the statutes administered by . . . any official . . . agency of the United States as . . . interpreted by the . . . agency or the federal courts." *See* N.Y. GEN. BUS. LAW § 349.

As a reminder, FDA's final monograph regulating over-the-counter cough medication does not require a drowsiness warning for medicines containing DXM. *See* 21 C.F.R. § 341.74(c)(4)(vii) (requiring drowsiness warnings for diphenhydramine citrate and diphenhydramine hydrochloride). But it does require other types of disclosures for DXM. *Id.* at § 341.74(c)(4)(v), (vi).

The FDA does not require a drowsiness warning, and TopCo did not provide one. As TopCo sees it, that is enough compliance to dock its ship squarely in the safe harbor.

This Court disagrees. A recent case from the Southern District of New York provides helpful guidance.

In *Bourbia v. S.C. Johnson & Son, Inc.*, 375 F. Supp. 3d 454 (S.D.N.Y. 2019), the court faced a similar claim about a label on a can of insect repellant. *Id.* at 459. Insect repellant is supposed to repel insects, but the consumer alleged that mosquitoes seemed unphased. The DEET-free formula didn't dissuade the mosquitoes.

The consumer brought a claim under New York's consumer-protection statute. The maker of the bug spray invoked the safe-harbor provision.

The Federal Insecticide, Fungicide and Rodenticide Act prohibits the selling of "misbranded" pesticides. *See* 7 U.S.C. § 136j(a)(1)(E). A pesticide is "misbranded" if its label is "false or misleading in any particular." *Id.* at § 136(q)(1)(A); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 438 (2005) ("A pesticide is 'misbranded' if its label contains a

---

the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by . . . any official . . . agency of the state of *New York*." (emphasis added)).

statement that is 'false or misleading in any particular,' including a false or misleading statement concerning the efficacy of the pesticide.").

That Act also contains a preemption provision. The statute expressly preempts "any requirements for labeling or packaging in addition to or different from those required under this subchapter." *See* 7 U.S.C. § 136v(b).

There, as here, the manufacturer sought refuge in the safe-harbor provision in the New York statute. But the district court ruled otherwise, reasoning that the claims were not preempted because "the complained-of statements fall within FIFRA's prohibition on 'misbranding.'" *Bourbia*, 375 F. Supp. 3d at 465.

"Since preemption precludes any state law labeling obligations in addition to or different from FIFRA, Defendant would only be liable under state law for labeling requirements that violate FIFRA (*i.e.* misbranding). The safe-harbor provisions are thus meaningless under the present circumstances." *Id.* at 466.

Basically, the state-law claims were not preempted because federal law prohibited misbranding insecticide. A state-law claim about a misleading label did not undercut federal law, because federal law prohibited the use of misleading labels, too.

In the case at hand, this Court concluded that the federal law does not preempt the state-law claims. There is no federal preemption, so there is no refuge in the safe harbor.

## III.    Breach of Express Warranty (Count IV)

The next claim is a breach of warranty claim. In Count IV, Calchi alleges that TopCo breached an express written warranty that the cough medication was "non-drowsy." *See* Am. Cplt., at ¶¶ 73–79 (Dckt. No. 47).

Under New York law,[5] a breach of warranty claim requires a plaintiff to allege: "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 589 (S.D.N.Y. 2021) (internal quotation marks omitted); *see also CBS Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1000–01 (N.Y. 1990). The buyer must also notify the seller of the breach "within a reasonable time after he discovers or should have discovered any breach." *Bassaw v. United Indus. Corp.*, 482 F. Supp. 3d 80, 86 (S.D.N.Y. 2020); *see also* N.Y. U.C.C. § 2-607(3)(a).

TopCo begins with a clunker. TopCo argues that Calchi does not allege an inconsistency between the promise and the product. Not so. Calchi alleges that TopCo sold non-drowsy cold medicine that made her drowsy.

Next, TopCo argues that Calchi failed to provide reasonable notice. The express warranty statute provides that the "buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *See* N.Y. U.C.C. § 2-607(3)(a).

TopCo contends that Calchi failed to give notice within a "reasonable time." Calchi provided notice by mailing a letter on February 8, 2022, just two days before filing suit. *See* Mtn. to Dismiss, at 13 (Dckt. No. 49). As TopCo sees things, mailing a letter two days before

---

[5] This Court applies Illinois choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Illinois courts generally apply Illinois state law (with some exceptions), but will apply another state's law if the parties agree that another state's law should apply. *See Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002). Both sides seem to agree that Calchi's claim is governed by New York state law. *See* Mtn. to Dismiss, at 10 (Dckt. No. 49); Pl.'s Resp. Brf., at 9 (Dckt. No. 51). So, this Court will apply New York law to her breach of warranty claim.

filing suit is not enough time for it to "minimize the buyer's loss and reduce the seller's own liability." *See Singleton v. Fifth Generation, Inc.*, 2016 WL 406295, at *12 (N.D.N.Y. 2016).

Calchi sent her letter to TopCo only two days before filing suit. In all likelihood, Calchi got to the federal courthouse before the US Postal Service got to TopCo's mailbox.

Even so, that argument measures time from the wrong vantage point. Under the statute, the question is not whether the seller had enough time to cure (even though that might be the underlying purpose). The question is whether the buyer gave reasonable notice "after he discovers or should have discovered any breach." *See* N.Y. U.C.C. § 2-607(3)(a).

Putting that issue aside, TopCo is onto something. Calchi bought the cold medicine in August 2021. *See* Am. Cplt., at ¶ 37 (Dckt. No. 47). She filed suit in February 2022, six months later. *See* Cplt. (Dckt. No. 1).

As this Court reads the complaint, Calchi bought the cold medicine in August 2021, and *took it* in August 2021. That's the most natural reading of the complaint. And that's how people tend to behave in the real world. Most people don't buy cold medicine unless they need it. People don't tend to buy cold medicine in the dead of summer just to stock up. (If that assumption is incorrect, Calchi can seek leave to amend.)

If Calchi took the cold medicine in August 2021, then it would not have taken long to figure out that she felt drowsy. She would have felt drowsy within the hour, give or take. Not six months later.

As this Court reads the complaint, Calchi took the medicine and felt drowsy in August 2021, but did not give notice to TopCo for six months. Waiting half a year is not a "reasonable time." *See* N.Y. U.C.C. § 2-607(3)(a).

Calchi overslept on her rights. The express warranty claim (Count IV) is dismissed.

### IV.    Magnuson-Moss Warranty Act (Count V)

The next claim is a breach of warranty claim under the Magnuson-Moss Warranty Act.

The claim is almost identical to the warranty claim under state law, for good reason.  The Magnuson-Moss Warranty Act "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action."  *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004); *see* 15 U.S.C. § 2310(d)(1) ("[A] consumer who is damaged by the failure of a . . . warrantor . . . to comply with . . . a written warranty . . . may bring suit for damages and other legal and equitable relief . . . in any court of competent jurisdiction in any State . . . or . . . in an appropriate district court of the United States.").  So claims under the federal statute "stand or fall" with warranty claims under state law.  *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008).

Like state law, the Magnuson-Moss Warranty Act includes a notice provision.  A consumer must give the seller a "reasonable opportunity to cure such failure to comply" with a warranty before filing suit.  *See* 15 U.S.C. § 2310(e).  Unlike the New York notice requirement, the federal notice requirement means that Calchi needed to give TopCo a chance to cure its failure before Calchi could file suit.

Whatever amount of time is reasonable, two days is not a lot of notice.  Again, Calchi likely reached the courthouse before her mail reached TopCo.

Either way, this Court dismissed the warranty claim under state law for failing to provide reasonable notice as required by *state* law, so the warranty claim under the Magnuson-Moss Warranty Act goes down with it.

As an aside, TopCo also poses a jurisdictional challenge to the claim under the Magnuson-Moss Warranty Act.  The statute provides that claims are not cognizable (1) "if the

33

amount in controversy of any individual claim is less than the sum or value of $25," (2) "if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit," or (3) "if the action is brought as a class action, and the number of named plaintiffs is less than one hundred." *See* 15 U.S.C. § 2310(d)(3)(A)–(C). TopCo thinks that Calchi does not meet any of these requirements. *See* Mtn. to Dismiss, at 14 (Dckt. No. 49).

Calchi responds by pointing to the provisions of the Class Action Fairness Act, the same statute that provides the jurisdictional foundation for the case as a whole. In Calchi's view, "CAFA creates an alternative basis for federal jurisdiction over a MMWA claim." *Van Zeeland v. McNally*, 532 F. Supp. 3d 557, 564 (N.D. Ill. 2021) (internal quotation marks omitted).

Courts are split on whether the Class Action Fairness Act can provide an alternative basis for jurisdiction to the Magnuson-Moss Warranty Act's more stringent jurisdictional requirements. *Compare Kuns v. Ford Motor Co.*, 543 F. App'x 572, 574 (6th Cir. 2013) (allowing CAFA to act as an alternative jurisdictional basis), *with Floyd v. Am. Honda Motor Co., Inc.*, 966 F.3d 1027, 1033–35 (9th Cir. 2020) (the opposite). The Seventh Circuit has not yet weighed in. *See Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 n.2 (7th Cir. 2021) (declining to decide the issue).

District courts in this district have found that the Class Action Fairness Act does create an alternative basis for federal jurisdiction. *See Van Zeeland*, 532 F. Supp. 3d at 564; *see also Stella v. LVMH Perfumes & Cosmetics USA, Inc.*, 564 F. Supp. 2d 833, 837–38 (N.D. Ill. 2008); *Clark v. Wynn's Extended Care*, 2007 WL 922244, at *4–5 (N.D. Ill. 2007) (St. Eve, J.). And, like in *Stella*, TopCo "fails to respond to this argument in its reply brief." *Stella*, 564 F. Supp. 2d at 838; *see* Def.'s Reply, at 9–10 (Dckt. No. 53).

In the end, there is no need to wade into the jurisdictional issue. The state claim fails on the merits, so the federal claim fails too. The claim under the Magnuson-Moss Warranty Act (Count V) is hereby dismissed.

## V.    Intentional Misrepresentation (Count VI)

The sixth and final claim is an intentional misrepresentation claim. Once again, the parties take it as a given that New York law applies. *See* Mtn. to Dismiss, at 14–15 (Dckt. No. 49); Pl.'s Resp. Brf., at 14–15 (Dckt. No. 51).

To state a claim for intentional misrepresentation under New York law, a plaintiff must show "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff[,] and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 910 N.E.2d 976, 979 (N.Y. 2009).

TopCo argues that Calchi has not adequately alleged knowledge and intent. *See* Mtn. to Dismiss, at 14–15 (Dckt. No. 49). In TopCo's view, Calchi is required under Rule 9(b) to "allege facts that give rise to a strong inference of fraudulent intent." *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

TopCo is mistaken. The requirement to allege facts supporting a "strong inference" of fraudulent intent comes from the line of cases about securities fraud, not fraud cases generally. *See Shields*, 25 F.3d at 1128; *see also* 15 U.S.C. § 78u-4(b)(2) (requiring securities fraud actions to allege "facts giving rise to a strong inference that the defendant acted with the required state of mind").

Rule 9(b) governs other types of fraud cases, like the case at hand. Under Rule 9(b), a party must allege the "circumstances" of the fraud with particularity. *See* Fed. R. Civ. P. 9(b).

But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *Id.*

The amended complaint satisfies that standard.  Calchi alleged that TopCo "researched the known and common side effects of DXM," and thus "knew that DXM causes drowsiness."  *See* Am. Cplt., at ¶ 34 (Dckt. No. 47).  She also alleged that TopCo knows the plain meaning of "non-drowsy," but chose to put the "non-drowsy" label on anyway.  *Id.*  And she alleged that TopCo must have tested the "non-drowsy" label with consumers, and figured out that it was misleading, because it is standard industry practice to test labeling with customers.  *Id.*

Based on those allegations, the amended complaint states a claim for intentional misrepresentation.  The motion to dismiss that claim is denied.

## VI.    Injunctive Relief

One final note.  Calchi asks for a slew of backward-looking remedies.  *See* Am. Cplt., at ¶ 98 (Dckt. No. 47).  But Calchi also asks this Court for injunctive relief against TopCo's deceptive conduct.  TopCo asserts that she does not have standing to pursue that kind of relief.  *See* Mtn. to Dismiss, at 15 (Dckt. No. 49).

Recall that standing requires an injury in fact caused by the defendant that is redressable in court.  *See Lujan*, 504 U.S. at 560–61.  Abstract injury is not enough.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101.  Any threat of injury must be "real and immediate," not "conjectural" or "hypothetical."  *Id.* at 102 (internal quotation marks omitted).

Importantly, standing is not "dispensed in gross."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008) (citing *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996)).  Instead, "a plaintiff must demonstrate standing for each claim he seeks to press and for *each form of relief* that is sought."  *Id.* (cleaned up) (emphasis added).

Calchi faces a problem here, because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014) (alteration in original) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)). "Once a plaintiff knows that a product is deficient, he or she is unlikely to purchase it again, and therefore unlikely to sustain future harm. A 'fool me once' plaintiff does not need an injunction if he or she is not going to buy the product again anyway. There is no risk of 'fool me twice,' so there is no basis for an injunction." *Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 702 (N.D. Ill. 2020).

Calchi does not allege that she will be purchasing TopCo's cough medication again. Just the opposite. Calchi says that she "would not have purchased the product[]" if she had known that it would cause drowsiness. *See* Am. Cplt., at ¶ 4 (Dckt. No. 47).

And even if Calchi would buy the cough medication again, she now knows that it may cause drowsiness. The "non-drowsy" label can't trick her now. That's why "[c]ourts in this district consistently hold that plaintiffs bringing deceptive trade practice claims based on past illegal conduct do not have standing to seek injunctive relief because plaintiff is aware of the allegedly deceptive practices and any potential for future harm is speculative." *Bruno v. Am. Textile Co., Inc.*, 2023 WL 6976826, at *6 (N.D. Ill. 2023); *see also Slowinski*, 2024 WL 3757097, at *6 (collecting cases).

The same is true here. Calchi does not have standing to pursue injunctive relief. Her request for injunctive relief is dismissed.

Calchi seeks leave to amend her complaint in light of this dismissal. *See* Pl.'s Resp. Br., at 15 (Dckt. No. 51). The Seventh Circuit has repeatedly emphasized that "[l]eave to amend a complaint should be granted liberally." *Glover v. Carr*, 949 F.3d 364, 370 (7th Cir. 2020); *see*

*also* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.").

This Court is skeptical of whether Calchi can plead facts sufficient to show standing for injunctive relief. But the Court will give her another chance. The Court grants Calchi leave to file a motion to amend within two weeks of this ruling.

## Conclusion

For the foregoing reasons, Defendant's motion to dismiss the amended complaint is granted in part and denied in part.

Date: September 30, 2024

_____

Steven C. Seeger
United States District Judge